## Case No. 10,305.

### NORRIS et al. v. COOK et al.

[1 Curt. 464.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1853.

PRINCIPAL AND AGENT — AGENT'S REQUEST FOR APPROVAL OF HIS ACTS—SILENCE OF PRINCIPAL —JURY—REQUEST TO COURT FOR INSTRUCTIONS.

1. If a consignee writes a letter to his consignor, and fully informs him what he has done, the silence of the consignee, after a reasonable time, is an approval of his conduct.

[Cited in brief in Feild v. Farrington, 10 Wall. (77 U. S.) 148.]

2. Though the consignee in such a case must have plainly disclosed a departure from instructions, and the reasons which induced him to depart from them, he is not bound to detail facts of a general nature, which he may reasonably presume the consignor has knowledge of.

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

3. If the jury send a written request for instructions to the court, when not in session, the court, after notice to the counsel, will reply in writing, if it deems it safe and proper to do so.

[Cited in Read v. Cambridge, 124 Mass. 569.]

This was an action of assumpsit, to recover of the defendants [George L. Cook, and others] the proceeds of the sales of a vessel and part of a cargo of lumber, consigned by the plaintiffs, who were merchants at Bristol, Rhode Island, to the defendants who were merchants at San Francisco, California, and also to recover the amount which ought to have been received from the sale of the residue of the cargo, which was consumed by fire, on shore, at the last mentioned place. The plaintiffs alleged that their orders to the defendants were to sell the vessel and cargo immediately, on their arrival; and that though there was no breach of orders as to the vessel, the cargo was landed and stored contrary to orders, a part sold afterwards, for a less price than could have been obtained on arrival, and the residue burnt in one of the conflagrations by which San Francisco had been visited. The defence was, that there was no breach of orders, or if there was any departure from instructions, it was known to the plaintiffs, and acquiesced in by them. After the jury had been fully instructed by the court, they retired to deliberate on their verdict, and the court adjourned till the next morning. In the course of the evening, the presiding judge received from the jury the following communication in writing: "The jury are not able to agree; and wish you to give us information on the grounds named below, viz. is it the duty of the consignor to inform the consignee that he approves or disapproves of his doings, or is his silence evidence of his acquiescence, generally?" On the receipt of this communication, the judge sent for the counsel on both sides, and made known to them, at his chambers, the above request of the jury, and read to them the following answer, which he proposed to send to the jury: "If the consignee writes a letter to the consignor, and fully informs him what he has done, and the consignor intends to disapprove of his conduct, he is bound to inform the consignee, within a reasonable time, that his conduct is not approved; and if he is silent, his silence is an approval of the conduct of the consignee. This is a rule of law, and is applicable to all such cases." The jury afterwards returned a verdict for the defendants, and the plaintiffs moved for a new trial, assigning for cause that the above instruction was not correct.

Greene & Blake, for plaintiffs.
Carpenter & Bradley, for defendants.

CURTIS, Circuit Judge. It is in accordance with the practice of this court, when a jury address a written inquiry to the court, while not in session, to summon the counsel, and make known to them the inquiry, and then proceed to answer it in writing, if the court thinks it safe and proper to do so; and no exception is taken to this course now. The objection is, that the instruction was not correct, because not sufficiently qualified. The argument is, that ratification is not binding, unless made with a full knowledge of all the material facts; and that the court ought to have required that the plaintiffs should be informed, not only of what the consignees had done, but of all the circumstances necessary to enable the consignors to make up their mind, understandingly. And that in this case, the consignors ought to have been told, not only that the consignees were about to land the cargo, but that the expenses of landing and storing a cargo there were unusually great, when compared with those charges at other ports; also, that timber was declining in price at the time it was landed, and how long the consignees intended to keep it on hand, and that the fire risks in that city were unusually great. The instruction given in this as in all other cases, must be considered with reference to the facts of the case. The consignment was made by letter, bearing date Feb. 11, 1850; which was received and replied to by the defendants, April 17, 1850. In this letter they say: "Lumber is, in some cases, selling at less than home prices, and vessels are extremely low. We see no fair prospect of any essential change in either." On May 29, 1850, the defendants acknowledged a receipt of a duplicate of the letter of consignment, and further say: "There is no improvement to notice in the lumber market." On the 27th July, 1850, the vessel and cargo arrived, and on the 31st the defendants wrote a letter, detailing, with great minuteness, the difficulties they had encountered in obtaining possession under the plaintiffs' mortgage, which was the title by virtue of which they made the consignment, and the litigation which had grown out of it, and referring the plaintiffs to their circular respecting the markets. On the 14th of August, they again wrote to the plaintiffs, informing them of their further difficulties about the title, and that they had sold the vessel well for $2,400. And they add: "The lumber is now being landed and stored, as we cannot get an offer of more than $50 per M. for the lot. We have been, and shall continue to be, as economical as possible in regard to expenses, but we anticipate we shall be able to remit you but a part of your claim." On the 31st August, 1850, the defendants again wrote to the plaintiffs, giving some further information about the litigation, and referring the plaintiffs to their circular for information of the state of the market. On the 13th September, they again wrote, chiefly concerning another suit which had been brought against them on account of the cargo, and adding: "We have no improvement to notice in the lumber market; on the contrary, prices generally are not so good as they were some weeks since." They also refer to their circular for further information concerning the market. It was admit-

ted that all these letters were received by the plaintiffs, but they first wrote in reply under date of October 25, 1850. In this letter they acknowledge the receipt of the defendants' letter of the 13th September, but make no reference to any other letter. They give some information concerning the title to the property, to enable the defendants to conduct the litigation, but they were entirely silent on every other topic. There was no evidence tending to show that any information concerning the markets, contained in the defendants' letters and circulars, was untrue. But it appeared that the charges of unloading and storing cargoes of lumber and all other commodities at San Francisco, were then, and, since the discovery of gold, and the consequent high prices, had been, very great compared with the charges at other ports, and that lumber was often, though not uniformly, sold before landing. Such were the facts, in reference to which this instruction was given. And I think there was no room to contend that the plaintiffs did not have all the information, concerning the state of the market, which the defendants could give. But, in respect to this, and the other facts, concerning the rate of charges and expenses, and the fire risks, a more comprehensive answer may be given to the objection, which, in my opinion, is well founded in law, and that is, that it is not the duty of the consignee to communicate anything which he has a right to presume the consignor knows. Now, when a merchant makes a consignment to a distant port, he is presumed to be acquainted with the nature of the business in which he engages; and this includes not only the customary modes of buying and selling, but the usual rates of charges, and the risks to which his property will be subjected at that port. And accordingly it will be found, by examining the decisions, that no one of them, so far as I know, has ever required information on these points to be given by the consignor.

The rule, as laid down by Mr. Justice Story, in his Commentaries on Agency, (section 258,) is: "If the principal, having received information from his agent, of his acts, touching the business of his principal, does not, within a reasonable time, express his dissent to the agent, he is deemed to approve his acts, and his silence amounts to ratification." This requires information of the acts of the agent, but not of those surrounding circumstances of a general nature, which usually accompany all such transactions, and which the principal must be supposed to be cognizant of when he made the consignment, and to have kept himself informed of afterwards. Take the rule laid down in Richmond Manuf'g Co. v. Starks [Case No. 11,802], which is supported by the authorities, that if a merchant neglects, after a reasonable time, to object to an account current, he is deemed to acquiesce in it, and it is treated as an account stated; it is manifest an account current conveys no information concerning the

previous or expected states of the market. In Cairnes v. Bleecker, 12 Johns. 300–306, Mr. Justice Spencer says: "It is a salutary rule in relation to agencies, that when the principal has been informed of what has been done, he must dissent, and give notice in a reasonable time, otherwise his assent to what has been done shall be presumed." And the same law may be found in Bredin v. Dubarry, 14 Serg. & R. 30, and in other cases.

Certainly the consignor must not be misled by the consignee, upon any point, general or particular; and he is entitled to such information concerning the acts of his agent as will put him upon a decision of the question whether he will ratify a departure from his orders. Thus, if the agent does not plainly disclose that he has departed from instructions, as was the case of Courcier v. Ritter [Case No. 3,282], he is not bound to reply. So I think the principal is entitled to a fair statement of any special circumstances which have induced the agent to depart from his instructions. And in this case there was such a statement; for in letters previous to that of the 13th of September, the defendants had informed the plaintiffs that lumber was very low, that there was no immediate prospect of its rise, and in the letter of the 13th of September they say: "The lumber is now being landed and stored, as we cannot get an offer of more than $50 per M. for the lot;" and there was no evidence in the case tending to show that this was not true, or that it was not the cause for their landing the cargo. Indeed, I do not understand the plaintiffs' counsel to contend, that the instruction given would not have been correct, if the consignment had been made to a port like Liverpool, or New Orleans; but it was argued that San Francisco, being in 1850 comparatively a new place of trade, the same presumption of knowledge, or the same duty, on the part of the consignor to inform himself concerning these general facts, did not exist. But I do not think the rule of law varies with the age and amount of trade of the port of destination. If it were to do so, I can conceive of no standard which could be applicable to any case. How old must a port be, and how much trade must it have had, and how long continued, to exempt the consignee from the duty of going into a minute history of all the facts which could have a bearing upon the interest of the consignor? If the trade is recent, if it is subject to great and sudden fluctuations, if the dangers from marine or fire perils at the port are unusual, the consignor may reasonably be supposed to have known these facts when he sent his property there; because, ordinarily, men do not embark in such enterprises without informing themselves on these points. And perhaps no case could be put which would afford a better illustration than this, of the impropriety of allowing the rule of law to be varied on account of any of these circumstances. For, in the first place, though the

trade was recent, yet it is known to have attracted a most extraordinary degree of attention from the commercial world, and its details were, and have continued to be made public, and watched with great interest, almost from day to day. And if I were now to hold, that San Francisco was not, as a place of commerce, in 1850, within the settled rules of law concerning the relative rights and duties of consignors and consignees, I fear I should be doing great practical injustice, and certainly I should not be able to say, at what period in its commercial life, these rules first began to be applicable. This would introduce a degree of uncertainty into the vast commercial transactions of that place, which would be as little consistent with the just interests of those engaged in them, as with the law itself, as I understand it. The motion for a new trial is overruled, and judgment is to be rendered on the verdict.